# La Belle Coke Company *v*. Smith, Appellant.

*Vendor and vendee—Articles of sale—Specific performance—Title—Boundaries—Deeds—Equitable estate.*

A title bond or articles for the sale of land, which does not set forth the purchase price, nor the terms of payment, nor indicate what the purchaser is to perform, cannot be specifically enforced.

Where an equitable owner of land under articles of purchase or a title bond, sells a portion of the land before he secures a deed, the grantee takes subject to the equities between the legal owner and the equitable owner. If a controversy between the legal owner and the equitable owner as to a boundary line is settled by a compromise deed, the pur-

chaser of a portion of the land from the equitable owner, pending the compromise, will be bound by the boundary line fixed by the compromise deed.

Argued May 11, 1908.   Appeal, No. 210, Jan. T., 1907, by defendant, from judgment of C. P. Fayette Co., March T., 1904, No. 22, on verdict for plaintiff in case of La Belle Coke Company v. Jeremiah Smith.   Before FELL, BROWN, MES-TREZAT, POTTER and ELKIN, JJ.   Affirmed.

Ejectment for coal underlying land in Luzerne township.

At the trial the jury returned a verdict for plaintiff subject to the question of law reserved.

The court subsequently entered judgment on the verdict UMBEL, J., filing the following opinion :

In the early part of the nineteenth century John Crawford owned several 100 acres of land situate on the Monongahela river in Luzerne township, Fayette county, Pennsylvania, including the coal, title to which is now in dispute in this case, and on February 18, 1830, he executed a bond to his son, William W. Crawford, in the sum of $6,000 conditioned that he should within one year execute to him, his heirs and assigns, a good and sufficient deed in fee simple for 200 acres of the said land, more or less, bounded by the courses and distances as surveyed by Joseph Crawford, Jr., with certain unimportant reservations, which bond was recorded January 6, 1838, in deed book " T," page 377, and the coal in question was included within the boundaries of the land referred to in said bond.

The conditions of the bond as to the making of the deed within one year and the conveyance of the identical land called for in the bond were not complied with, nor is there any evidence that the said William W. Crawford, the obligee in the bond, took any legal steps toward enforcing his rights under it, nor was deed made to him for any part of the 200 acres until 1840.

Recorded with the bond is an ex parte affidavit, dated January 1, 1836, of Joseph Crawford, Jr., referred to in the bond as the engineer who made the survey, setting forth :

1. The courses and distances of the survey, seemingly so far

as material to the controversy between the parties, as follows:
" Beginning at a stone near the spring run 70 perches from a
stone in the division line between William Crawford, brother
of John Crawford, and John Crawford, S. 75° W. 51 perches
to a stone; thence S. 18¾° E. 94.5 perches to a sugar tree;
thence S. 72° W. 35 perches to a W. O. on top of the river
hill ; thence same course to the river," which includes the coal
in question within the aforesaid 200 acres, more or less.

2. That he believed the said survey is the one alluded to in
the said bond of February, 1830.

3. That John Crawford told deponent that the land con-
tained within the above-mentioned lines was exclusively for
his son William W. Crawford, making mention at the same
time that there was one field more in the survey that he orig-
inally intended to give William but on reflection he thought
William was entitled to in consideration of some debts he,
William, had paid for John's son-in-law.

4. That John Crawford repeatedly told deponent that Wil-
liam W. Crawford was to have the land above mentioned one
or two years after the land alluded to was executed.

5. William W. Crawford called upon deponent to make the
survey, which survey deponent made in the presence of John
Crawford, the father, the plot of which survey deponent gave
into the possession of his father, Joseph Crawford; at that
time John Crawford told deponent he had agreed to give Wil-
liam W., his son, a deed according with the second survey, ex-
cepting a portion of the river hill.

There is also recorded with the said bond another ex parte
affidavit dated January 1, 1836, of John Bower, who says the
bond was drawn up by him, that it was voluntarily executed
by said John Crawford and that deponent's recollection is
that it was prior to the last marriage of said John Crawford.

Which two affidavits, while of small material consequence in
the adjustment of the matter in dispute, show conclusively that
there was then and evidently for some time had been a con-
troversy between John Crawford and his son William W.
Crawford regarding what should be included in the convey-
ance, affecting particularly the lines as bearing on the part of
the said 200 acres over and in the vicinity of the coal in ques-
tion.

By deed dated December 30, 1837 (two years after the date of the above affidavit), William W. Crawford et. ux., conveyed to Henry Turner the following described land : " A certain lot of ground situate near the Monongahela river in the county aforesaid bounded as follows : Beginning at a sugar tree near the coal bank belonging to Joseph Davis and running S. 17° W. 200 feet in front along the said river and extending back 300 feet between the parallel lines bearing N. 73° E. and also the coal under the ground between said parallel lines continuing in the same course as far back as the said William W. Crawford's land extends," which by legal conveyance, etc., in due time became vested in the defendant.

By deed dated April 3, 1841, William W. Crawford and wife conveyed to Gideon John a part of the said premises fronting 12.85 perches on the river and extending back 12.85 perches between parallel lines bearing north 73° east, forming a square containing 165 perches, " also the coal lying under the surface of the ground embraced between the two parallel lines aforesaid continued in the same course, viz.: N. 73° E. as far back as said William W. Crawford's land extends," which by due and legal conveyance became vested in the defendant.

Other conveyances were made by said William W. Crawford of coal lots or tracts near and adjoining the Turner and Johns lots aforesaid bounded on the north and south by lines parallel to the longest lines of said Turner and John lots and in each deed there is included " also the coal under the ground back of said lot embraced between the above described parallel lines continued in the same course as far back as said William W. Crawford's land extends."

The indefiniteness of the extent of the coal conveyed in each instance and the failure to locate the real line, conclusively establish that such line was uncertain and not fixed, and that it was doubtless the occasion of controversy between said John and William W. Crawford, further evidence of controversy between them is the action of ejectment instituted by John Crawford against William W. Crawford, Henry Turner et al., at No. 49, June Term, 1838, for the 200 acres referred to in the above-mentioned bond, which action was compromised and settled after December, 1839.

In the limited time we have been able to devote to the con-

sideration of this case, we have not discovered any authority holding or indicating that, on failure or refusal of John Crawford to carry out the condition of the said bond, the obligee, William W. Crawford, could enforce specific performance and compel conveyance to him of the said 200 acres. If the obligor failed or refused to convey, etc., the obligee's remedy would be to sue on the bond, in view of which we seriously question whether such title vested in the obligee in the bond under the provisions thereof as would enable him to make conveyance of title to the Turner and other lots or any part of the said 200 acres without other and further action on the part of the obligor, except subject to the existing equities between John and his son, William W. Suppose the obligor for some reason had refused absolutely to convey all or any part of said 200 acres, as the action of ejectment at No. 49, June Term, 1838, indicates he contemplated, would not the obligee have been limited to recovery on the bond and the obligor could not have been held liable beyond the penalty thereof? Suppose, further, that the obligor had elected not to convey and proceeded forthwith to the obligee and advised him accordingly and thereupon paid, or in good faith offered to pay, him the $6,000 penalty provided in the bond, would it be contended that such action on the part of the obligor did not free and clear him and operate to satisfy the said bond and at the same time wipe out every possible interest and claim that the obligee had or could have in the said 200 acres and every part thereof under the said bond? We strongly incline to the conviction that these considerations would have to be decided in favor of the obligor: Streeper v. Williams, 48 Pa. 450; Mathews v. Sharp, 99 Pa. 560; Clements v. R. R. Co., 132 Pa. 445.

The purchaser (Turner et al.) of an equitable title or of a title inchoate or defective on its face, takes it subject to all the countervailing equities to which it was subject in the hands of the person (William W. Crawford) from whom he purchases; he cannot claim to be placed in a better position than such person; it is only the purchaser of a title perfect on its face, for a valuable consideration, who takes it discharged from every equity or claim of which he had no notice: Chew v. Barnet, 11 S & R. 389; Chew v. Parker, 3 Rawle, 283; Reed v Dickey, 2 Watts, 459; Kramer v. Arthurs, 7 Pa. 165.

The agreement between John Crawford and William W. Crawford, dated July 24, 1840, by which their differences were adjusted, provides as follows, viz. :—" Whereas there had been some dispute between us in relation to the land for which John Crawford was bound to make a title to his son, William W. Crawford. And in order to settle all further dispute and controversy on the subject and to fix a proper line between us. It is hereby now agreed by John Crawford of Fayette county, Pa., of the one part and his son William W. Crawford of the other part, that the said John Crawford shall make a good and sufficient deed in fee simple for 190 acres of the tract of land on which they both now reside to be run off as follows so as to include the part on which said William now resides, viz. :—Beginning at the Monongahela River at the corner between William Crawford, and brother of said John Crawford, thence by the courses and distances of the patent up the river to the coal bank of Henry Turner so as to include. the same, thence up the river hill to the top, thence along down the river on the top of the hill to a point from which by running a straight line across to the line between said John Crawford and his brother William Crawford so as to include in the whole 190 acres, thence by the line between said John and his brother William to the corner on the river, the place of beginning. The said William W. Crawford to have the privilege of running back under the land of said John Crawford from the coal bank of Henry Turner, reserving also sales already made to Turner and others as to mining by the said William W. Crawford. Said John Crawford to make said deed and survey on or before the first day of October next with notice to the said William W. Crawford, said survey to be made by the county surveyor or John I. Dorsey."

The deed made in pursuance of the said agreement is dated September 22, 1840, and contains a description of the said 190 acres by courses and distances and also the provisions quoted last above in the agreement of compromise regarding the privilege of William W. Crawford running back under the land of John Crawford, etc. It will be observed that the Turner deed was made before and the John deed after September 22, 1840, but one of the other deeds offered in evidence, dated previous to September 22, 1840, recites such matter as indicates that

William W. Crawford sold to John before the last-named date.

Referring to the courses and distances set forth in the affidavit of Joseph Crawford, Jr., recorded with the above-mentioned bond, and the courses and distances set forth in the deed of September 22, 1840, and comparing plots offered in evidence that were made in pursuance thereof, it clearly appeared that the coal in question was not included in the conveyance of September 22, 1840, and that the said rear property line of William W. Crawford was the western end of the coal in dispute.

If conveyances had been made by John Crawford to William W. Crawford, as provided in said bond of February 18, 1830, the said rear property line would have been about 120 perches from the front line of the river.

The surface tracts conveyed by William W. Crawford to Henry Turner et al. extends back from the river only from about twelve to eighteen perches, and the coal intended to be conveyed would extend, according to the claim of the defendant, considerably beyond what was under the surface lots—it was, in addition to what was under the surface lots, a narrow strip, from 200 to 300 feet wide, extending back from the rear line of the surface lots to the rear or eastern property line of John Crawford, noted in the above-mentioned affidavit of Joseph Crawford, Jr., as seventy perches in length, between a stone near the spring run and a stone in the division line between John Crawford and his brother William, a distance of from 102 to 107 perches from the rear line of the surface lots.

According to the agreement of compromise of July 24, 1840, and the deed made in pursuance thereof, it was definitely ascertained, determined and established for the first time, so far as appears from the evidence, that the said property line of William W. Crawford at the point in question was only 37.7 perches from the river, instead of about 120 perches, which would extend defendant's coal back beyond the rear line of the surface lots from nineteen to twenty-four perches instead of from 102 to 107.

The established facts satisfy us beyond a doubt that the said rear line was a bone of contention between John Crawford and William W. Crawford for years, and was not defi-

nitely determined until. the execution of the agreement of compromise in July, 1840, and the deed made in pursuance thereof in September of the same year, and we believe and conclude such condition was the occasion of the indefinite description and uncertain extent of the said coal, being described as " the coal under the ground between said parallel lines continued in the same course as far back as the said William W. Crawford's land extends," and William W. Crawford having at most only a defeasible equitable title, the sales were made and the deeds accepted by Henry Turner et al. with the understanding that the rear line of their coal was to be the line finally determined and agreed upon as the rear property line of William W. Crawford, else why would the deeds not have expressed clearly that they were to extend to a certain, fixed, definite line which could easily have been done if defendant's contention be correct, but which could not be done in any other way, manner or language than that used, if the rear line of William W. Crawford was undetermined and the extent of his land uncertain, as it was at the time the Turner and Searight deeds and Gideon John's contract were made ?

We think this conclusion is warranted by the principle stated by our Supreme Court in Meigs v. Lewis, 164 Pa. 597, cited by defendant, which holds that " In construing a deed it is proper and sometimes necessary to consider the circumstances under which it is made for the purpose of ascertaining the intention of the parties," which is abundantly sustained by a long line of decisions.

In the same case, quoting from Lacy v. Green, 84 Pa. 514, we find : " When the meaning of an agreement is doubtful its terms are to be considered in the light thrown on them by proved or admitted illustrative facts. The situation in which the parties stand, the necessities for which they would naturally provide, the conveniences they would probably seek to secure, and the circumstances and relations of the property, regard to which they have negotiated are all elements in the interpretation of an ambiguous contract."

It is earnestly insisted on the part of the defendant that the provision in the agreement of compromise and the deed from John Crawford to William W. Crawford in 1840, as

follows,. viz. : " The said William .W. Crawford to have the privilege of running back under the land of the said John Crawford from the coal bank of Henry Turner, reserving also the sales also made to Turner and others as to the mining, by the said William W. Crawford," amounts to a conveyance of the title from John Crawford to the vendees of William W. Crawford for the coal between the rear line of William W. Crawford as established by the deed of September 22, and the. eastern line of John Crawford, which is the coal in dispute, which contention we cannot approve as it is lacking in the requisite formalities necessary and incident to a legal conveyance.

What is the meaning of the expression, " the said William W. Crawford to have the privilege of running back under the land of the said John Crawford from the coal bank of Henry Turner " ?

Adopting the contention of the defendant, barring conveyance, that it was intended. to extend to William W. Crawford and his grantees the right to mine and remove the coal in question, as well as the coal in rear of other lots, it develops a condition at once unreasonable, if not absurd, in limiting the privilege to " the coal bank of Henry Turner," as there were several other lots conveyed by William W. Crawford adjoining and fronting on the river for a distance of about one-third of a mile, and defendant's exhibits show that there were .several other banks, yet, under the above, all the coal back of what was established to be the rear line of the land of William W. Crawford would have to be brought out the Turner bank.    We cannot conclude otherwise than that it was intended to be a personal privilege extended to William W. Crawford " of running back under the land of the said John Crawford from the coal bank of Henry Turner." For what purpose is not expressed, but doubtless for the purpose of taking out coal conveniently located, if an arrangement should be effected. along the line between the said William W. Crawford and Henry Turner for the use of the latter's bank, and, in our opinion, it has no connection or reference whatever to any previous conveyance made by William W. Crawford, which conclusion we think is warranted by the clause next following the above quoted, viz. : " Reserving also the sales already made

to Turner and others as to mining by the said William W. Crawford."

If the clause quoted first above had been intended to refer to the Turner et al. conveyances, it could easily have been so expressed in language clear and ambiguous, and the second clause last above quoted " reserving also," etc., referring to the Turner et al. lots, indicates to our mind that the first clause does not have any reference to the Turner et al. lots.

It is undoubtedly true if John Crawford had made conveyance to William W. Crawford in such way as to have given title to William W. Crawford to the line claimed by defendant as the rear line of William W. Crawford's land such conveyance would have enured to the benefit of the defendant and its predecessors in title and he would now be entitled to the property. But such uncertain and indefinite statement as relied on by the defendant quoted above cannot, in our opinion, be the basis for claim to title to real estate under the circumstances of this case.

The language quoted above in one way almost warrants the conclusion that John Crawford, instead of ratifying and confirming the sales to Henry Turner and others by William W. Crawford, meant to repudiate such action and reserve to himself the right of making such conveyances as above indicated in " reserving also the sales already made to Turner and others as to mining by the said William W. Crawford," which can hardly be taken to mean a ratification, but is rather in the nature of a reservation, which in law is said to be " an express withholding of certain rights, the surrender of which would otherwise follow or might be inferred from one's act." Applying the principles set forth in Rock Island Ry. Co. v. Rio Grande R. R. Co., 143 U. S. 596, to the effect that the meaning of a reservation must be determined in every case by the particular facts of the case, such as the character of the conveyance, the nature and situation of the property conveyed and of the property reserved or excepted and the purpose thereof, to the facts here, inclined us to doubt that the intention of the conveyance in question was to ratify and confirm the titles from John Crawford to the grantees in " the sales already made to Turner and others " by William W. Crawford.

But grant that it is confirmatory in character, what does it confirm ?    "The sales already made to Turner and others."

What were the "sales already made to Turner and others"?

Certain surface lots and coal under them and under the ground in rear of them extending "as far back as the said William W. Crawford's land extends."

We now come to the most important question, viz.: How far does William W. Crawford's land extend, or how far did it extend at the time of the execution of such deeds?

That is not fixed or certain, but is in controversy, uncertain, indefinite, and the uncertainty attending it was current rumor in the community at the time of "the sales made to Turner and others," and it cannot be determined until their differences are adjusted, which is done in July, 1840.

True, in view of the deed of September 22, 1840, we question the necessity of any confirmation of the Turner et al. deeds, and, if confirmed, it was doubtless occasioned by the fact of the previous and existing controversy attending when these deeds or the sales were made and was done at the suggestion and request of William W. Crawford or Turner et al. so as to free the matter from other or further question, and such confirmation did not apply beyond the line 37.7 perches from the river.

Inasmuch, then, as the land of William W. Crawford does not and never did by any title other than a defeasible one, extend back to the line 120 perches from the river, claimed by the defendant as the rear line of the said coal lots, no conveyance of his could give title beyond his rear line, as definitely determined to be 37.7 perches from the river, and taking all the records and giving to each its fullest force we cannot discover such facts and conditions as warrant us in holding that the title to the coal in dispute ever passed from John Crawford down the line of conveyances, etc., claimed by the defendant, but we do find and conclude that the due and legal title to the coal in dispute, did pass from John Crawford down the line claimed by the plaintiff and is now fully and completely vested in the La Belle Coke Company.

*Error assigned* was in entering judgment on the verdict for the plaintiff.

*H. L. Robinson*, of *Robinson, McKean & Martin*, with him *R. W. Dawson*, for appellant.—In construing a deed it is proper and sometimes necessary to consider the circumstances under which it was made for the purpose of ascertaining the intention of the parties: Meigs v. Lewis, 164 Pa. 597; Lacy v. Green, 84 Pa. 514.

Words in a deed or written instrument should be taken most strongly against him whose words they are: Algonquin Coal Co. v. Coal & Iron Co., 162 Pa. 114.

When the words used in the description in a deed are uncertain and ambiguous and the parties have by their acts given a practical construction thereto, the construction put upon the deed by them may be resorted to, to aid in ascertaining their intention: Province v. Crow, 70 Pa. 199.

*Geo. D. Howell*, of *Howell, Sturgis & Morrow*, for appellee.

OPINION BY MR. JUSTICE POTTER, June 2, 1908:

This was an issue in ejectment framed to try the ownership of the coal underlying a tract of land in Luzerne township, Fayette county, Pennsylvania. The trial judge directed a verdict for the plaintiff subject to a point of law reserved, and subsequently discharged a rule for judgment non obstante veredicto and entered judgment upon the verdict. The question raised by this appeal involves the proper construction of a title, bond or agreement of John Crawford, dated February 18, 1830, in which he agreed to convey about 200 acres of land to William W. Crawford. And as no deed was executed by John Crawford within the time stated in the bond, and as a controversy arose between John Crawford, the father, and William W. Crawford, his son, with regard to just how much or what was to be conveyed under the bond, and this controversy, the parties attempted and intended to settle by a compromise agreement dated July 24, 1840, it became necessary also to construe the terms of that compromise agreement.

The point in dispute was as to the limits of the coal tract; whether it ceased at the brow of the river hill or extended back of and beyond that line. During the continuance of the controversy in December, 1837, William W. Crawford sold a portion of the ground, and being uncertain as to the definite

location of his line, in a deed to Henry Turner, he conveyed
as far back " as the said William W. Crawford's land extends."
From this it is plain that he intended to convey to the limit
of his own title, wherever that might be. As the trial judge
says, " William W. Crawford having at most only a defeasible
equitable title, his sales were made and the deeds were ac-
cepted by Turner et al., with the understanding that the rear
line of their coal was to be the line finally determined and
agreed upon as the rear property line of W. W. Crawford."
The court below was of the opinion that under the bond for a
deed given by John Crawford, specific performance could not
have been enforced. We coincide with this view. The bond
does not set forth the purchase price, nor the terms of pay-
ment, nor is there anything upon the surface of the paper to
indicate what the purchaser was to perform. This in itself is
enough to prevent specific performance. We are satisfied that
the trial judge was right in his conclusion that any conveyance
which might have been made by William W. Crawford must
have been subject to the equities between him and his father,
John Crawford. Nor are we able to find anything in the
record to sustain the position which appellant's counsel seem
to have assumed, that William W. Crawford was in actual
possession of the coal now in dispute. The contrary would
seem to be true, for when the dispute was finally settled, in
the compromise agreement of 1840, between the two Craw-
fords, it was determined that the title of William W. Craw-
ford did not extend beyond the line along the brow of the river
hill. In that settlement, John Crawford agreed to make a
deed " to William for 190 acres of the tract on which they both
now reside, to be run off as follows, so as to include the part
on which said William now resides." We do not understand
that any of the coal now in dispute was included in the 190
acres above referred to ; and from the plots offered in evidence,
it seems that the rear property line of W. W. Crawford is the
western line of the coal in dispute. In the compromise agree-
ment, and in the deed made in pursuance of it, there was a
provision extending to William W. Crawford the privilege of
running back under the land of the said John Crawford, but
this the trial judge construed as being only a personal privi-
lege to William, and not as a conveyance of the title to the

coal. The language is not clear, but we cannot say that the court below was wrong in holding that the purpose was to permit William W. Crawford to take out such coal as he might need for his own use.

Counsel for appellant have contended with much force, that the proper construction of the original bond for title, and the language of the compromise agreement, and the various deeds offered in evidence, was sufficient to establish title to the coal in controversy, in the defendant. We are satisfied, however, from our examination of the record, that we would not be justified in reaching a conclusion in this respect, different from that reached by the trial judge. We can add nothing to his detailed discussion of the various papers offered in evidence, and their meaning and effect, as conveying the title from John Crawford. It would be fruitless for us to add to, or repeat what has has been well said, in this connection, in the opinion of the court below in entering judgment for the plaintiff. We coincide with the final conclusion, that the legal title to the coal in dispute did pass from John Crawford down the line, as claimed by the plaintiff, La Belle Coke Company.

The judgment is affirmed.